IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.                                     Civ. No. 18-623

$57,586.00 IN U.S. CURRENCY,

    *Defendant-in-rem.*

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, United States of America, brings this complaint in accordance with Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, and alleges as follows:

### NATURE OF THE ACTION

1. This is a civil action to forfeit and condemn to the use and benefit of the United States of America property involved in violations of the Controlled Substances Act and 18 U.S.C. § 1952 that is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

### DEFENDANT *IN REM*

2. The defendant *in rem* consists of the following:

    i. Fifty-seven thousand five hundred eighty-six dollars ($57,586.00) in U.S. Currency,
    (hereafter referred to as "Defendant Currency").

3. The Defendant Currency was seized by the Drug Enforcement Administration on February 16, 2018, in the District of New Mexico.

4. The Defendant Currency is now, and during the pendency of this action will be, in the jurisdiction of this Court.

## JURISDICTION AND VENUE

5. The United States District Court for the District of New Mexico has subject matter jurisdiction under 28 U.S.C. §§ 1345, 1355(a) and 1356.

6. Venue for this civil forfeiture action is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395, as acts or omissions giving rise to the forfeiture took place in this district and the property is found in this district. Upon the filing of this complaint, the Defendant Currency will be arrested by execution of a Warrant for Arrest *In Rem* in the District of New Mexico.

## FACTS

7. On February 16, 2018, Drug Enforcement Administration (DEA) Agents from Albuquerque District Office conducted a consensual encounter with Vernon Gatlin, and his wife, Lizbeth Gatlin, at Cutter Aviation in Albuquerque.

8. On February 16, 2018, at approximately 9:00 a.m., Albuquerque Police/Aviation Police (Lt.) Tim Esquibel informed DEA agents that an individual identified as Vernon Gatlin had been reported by Cutter Aviation for flying erratically on the evening of February 15, 2018. Gatlin reportedly missed four landing attempts, and smelled of marijuana and alcohol once he landed. Cutter Aviation personnel further advised that Gatlin arrived with a female, and they had a number of bags with them. According to Cutter Aviation records, Gatlin had requested that the plane be ready to depart at approximately 10:00 a.m. on February 16, 2018.

9. At approximately 9:35 a.m., SA Abrahao spoke with Cutter Airport manager, Jessi Rowden. Rowden stated that on the night of February 15, 2018, the control tower reported an airplane had attempted to land several times and the pilot, Vernon Gatlin, had problems following instructions. Rowden stated that she instructed her employees to report any issues with the pilot and/or plane once it landed. Rowden stated that once the plane landed, the pilot and one passenger took a while to deplane. Rowden stated that once the Gatlins exited the plane, her employees reported a very strong odor of

marijuana coming from the airplane. Rowden further indicated that Mr. Gatlin had called the airport on the morning of February 16, 2018, and stated that he and his wife would be arriving in a Hilton hotel shuttle.

10. At approximately 9:49 a.m. canine handler Task Force Officer (TFO) Jason Franklin deployed his trained and certified drug detection canine, "Angel" to conduct an exterior open-air canine inspection of Gatlin's aircraft. The parked aircraft was by the airport office building. "Angel" alerted positive for the odor of illegal controlled substance emanating from the airplane. Also, present with TFO Franklin was TFO Tom Novicki.

11. At approximately 10:50 a.m., DEA Special Agent Geronimo Abrahao observed a Hilton Shuttle arriving at Cutter Aviation. Mr. and Mrs. Gatlin exited the shuttle carrying their suitcases, and other bags in one rolling cart.

12. At approximately 10:53 a.m., Agent Abrahao approached Mr. Gatlin as he entered the airport lobby area. Agent Abrahao presented Mr. Gatlin with DEA credentials and identified himself as a DEA Agent. Agent Abrahao requested Mr. Gatlin's persmission to speak with him regarding the February 15, 2018 landing issues. Agent Abrahao informed Mr. Gatlin that his plane reportedly smelled of marijuana. Mr. Gatlin responded "you all can go look, check it out." At approximately 10:54 a.m., Agent Abrahao asked Mr. Gatlin to accompany Agent Abrahao and FAA Agent Dennis Beattie into the conference room to talk. Albuquerque/Aviation Police Officer G. Esquibel was present and had his body camera turned on during the consensual encounter.

13. Agent Abrahao asked Mr. Gatlin how many times he attempted to land. Mr. Gatlin responded he attempted to land three times, and followed by saying "I didn't have any drinks buddy, I can guarantee you that." Agent Abrahao never asked Mr. Gatlin about drinking. Agent Abrahao thanked Mr. Gatlin for his cooperation and asked where he and his wife, Lizabeth Gatlin, were coming from. Mr.

Gatlin responded that he and his wife were coming from Forth Worth, TX, and headed to Carmel in California.

14. Agent Abrahao asked Mr. Gatlin if he wanted to talk about the reported smell of marijuana. Mr. Gatlin responded that he smoked cigars, and that after the landing from the night before he needed cigars. When asked, Mr. Gatlin stated that he lives in Forth Worth and that the airplane belongs to him. Agent Abrahao asked if the airplane was in his name, Mr. Gatlin responded that the plane is registered to a Limited Liability Company (LLC) named N169WT LLC. Mr. Gatlin also said he is originally from Waco, TX.

15. Agent Abrahao mentioned that Mr. Gatlin had said he would have no issues with agents looking in the plane. Mr. Gatlin responded, "Yes sir." Mr. Gatlin stated that he did not know and asked if he should call a lawyer. Agent Abrahao explained to Mr. Gatlin that the drug detection had alerted for the odor of drugs coming from the plane. Mr. Gatlin asked what drugs, Agent Abrahao responded that the canine was a narcotics canine. At that point, TFO Novicki notified Agent Abrahao that canine Angel also had alerted positively for odor of illegal narcotics emanating from the Mr. Gatlin's luggage in the lobby of the airport.

16. Agent Abrahao asked Mr. Gatlin if he had anything illegal in the plane, such as large amounts of drugs, cash, or guns. Mr. Gatlin responded that all they would find would be bags and clothes. Agent Abrahao asked Mr. Gatlin if his wife used any recreational marijuana. Mr. Gatlin responded that Agent Abrahao should have asked if him if he used marijuana. SA Abrahao asked Mr. Gatlin if he used any marijuana, at which time Mr. Gatlin responded he does use marijuana sometimes.

17. Agent Abrahao told Mr. Gatlin that the FAA was there due to the issues he had landing, but that DEA was interested in finding out about drug transportation. Agent Abrahao asked again for consent to search the plane and his personal belongings, at which time Mr. Gatlin indicated he had no

4

issues with the search. Mr. Gatlin further stated that he was an All State Agent, had run for City Council, and was a community leader. Mr. Gatlin said, "I don't run drugs man."

18. Agent Abrahao asked Mr. Gatlin again if he had used marijuana when he was flying the night before. Mr. Gatlin said no, and indicated that he did not smoke or drink before flying. Agent Abrahao asked Mr. Gatlin if his wife had smoked. Mr. Gatlin responded no. Agent Abrahao reminded Mr. Gatlin that he was being "straight forward" with him. Mr. Gatlin said, "I'm not being arrested. I'm being searched." Agent Abrahao explained to Mr. Gatlin that canine Angel had also alerted positively on his bags that were outside in the lobby. Agent Abrahao indicated that he would not arrest Mr. Gatlin for small amounts of marijuana. Mr. Gatlin responded that he had a small personal use amount of marijuana inside of a container in his bag.

19. Agent Abrahao explained that it was Mr. Gatlin's choice to give consent for agents to search the airplane, the bag in the plane, and the bags in the lobby. Agent Abrahao explained that he could hold the bags and write a search warrant for the items mentioned. Mr. Gatlin asked what Agent Abrahao wanted to do. Agent Abrahao stated that he wanted to search the bags, but he was not detaining Mr. Gatlin or going to take him to jail. Agent Abrahao explained that he was only asking for Mr. Gatlin's consent, but he did not have to consent. Mr. Gatlin said he did not know what to do and mentioned having rights. Agent Abrahao confirmed that he did have rights and that he could inform Mr. Gatlin of his rights if that was his preference. Mr. Gatlin stated that he preferred to be informal and not get arrested. Mr. Gatlin said he did not feel he was doing anything wrong and that all Agents would find was some marijuana. Mr. Gatlin stated that he was not flying marijuana.

20. Agent Abrahao again asked if he would consent to search the airplane and the bags. Mr. Gatlin asked, "What would be bad if you found any drugs?" Mr. Gatlin further stated, "You have my consent." Agent Abrahao again said that was looking for drugs, money, guns that were being transported illegally. Mr. Gatlin informed Agent Abrahao that he had a gun in his backpack, and a license to carry a

gun. Mr. Gatlin also stated that he wanted to cooperate and that flying was a privilege. At approximately 11:01 a.m., Agent Abrahao left the room to inform other agents/officers that Mr. Gatlin had consented to the search.

21. At approximately 11:03 a.m., Agent Abrahao returned to the conference room. Mr. Gatlin asked about Mrs. Gatlin, Agent Abrahao responded that she was outside sitting in the lobby area talking to one of our agents. Mr. Gatlin stated that he was never in trouble. Mr. Gatlin said, "I'm a community leader dude, I don't buy drugs, if you guys have to check where you have to check." Mr. Gatlin asked what agents were going to do with his "stash," referring to the personal marijuana in his possession. Agent Abrahao responded that agents would have to seize the marijuana, because it is a controlled substance.

22. Agent Beattie asked Mr. Gatlin for his medical card required for flying. Mr. Gatlin responded he did not have the medical card with him. Officer Esquibel asked Mr. Gatlin for his Drivers License (DL). Mr. Gatlin asked Officer Esquibel to take the driver license out of his wallet because Mr. Gatlin was too nervous to take it out. Officer Esquibel collected Mr. Gatlin's information and returned his drivers license. Agent Abrahao asked Mr. Gatline if there was anything else in his backpack aside from the gun that would be concerning. Agent Abrahao stated that he had no issues with people carrying guns legally. Mr. Gatlin responded that he was one of the "good guys."

23. Mr. Gatlin continued carrying a conversation with agent Beattie and Agent Abrahao, about his wife's job, and his flight experience as a pilot. Agent Abrahao asked Mr. Gatlin how many planes he had. Mr. Gatlin responded only the one at the airport. Agent Abrahao asked Mr. Gatlin if he had any other planes under the LLC, at which time Mr. Gatlin responded that he had another plane under the LLC which is the same as the LLC's name, N169WT LLC. Mr. Gatlin stated that N169WT was totaled and said, "You all probably knew that," and instead of creating another LLC he just used the same one.

24. Agent Abrahao asked Mr. Gatlin how the other plane was totaled, referring to N169WT. Mr. Gatlin appeared agitated at that point and said, "I'm going to have to get a lawyer man." Mr. Gatlin also said that agents had not found anything, he had not done anything, and since agents had found his, "stash," he would go to jail if he had to. Mr. Gatlin also said, "You are talking to the wrong guy." Mr. Gatlin stated that the incident with the other plane, was one of the worst incidents in his life. He crashed the other plane at a small run way and did not like to talk about it because it is embarrassing. Agent Abrahao explained to Mr. Gatlin that no one was trying to embarrass him, and that the reason Agent Abrahao asked was because it was important to know. Agent Abrahao also informed Mr. Gatlin that since he had requested an attorney, questions would cease. Mr. Gatlin responded he felt like he should have a lawyer.

25. At approximately 11:08 a.m., as Agent Abrahao was preparing to issue Mr. Gatlin *Miranda Warnings*. Mr. Gatlin stated he had not asked for a lawyer. Agent Abrahao informed Mr. Gatlin that their conversation was being recorded, and that as a federal agent, Agent Abrahao had an obligation to inform him of his rights at that point. At approximately 11:09 a.m., as Agent Abrahao continued to attempt to issue *Miranda Warnings* to Mr. Gatlin. Mr. Gatlin stood up and became agitated again. Mr. Gatlin asked about his wife. Agent Abrahao asked Mr. Gatlin to sit down at that point, while Mr. Gatlin became argumentative as to weather he had requested an attorney or not.

26. At approximately 11:10 a.m., Agent Abrahao received a call from Agent Croft. She had found a large suitcase in the plane containing three large duffle bags that smelled of fresh marijuana and with marijuana residue inside. Agent Croft further stated that she had found several large vacuum seal bags, consistent with bags used to transport large quantities of marijuana. Agent Croft stated that with the duffle bags and vacuum seal bags, she found one pink bag containing a large amount of United States Currency, and a larger vacuum seal bag, with a large amount of Unites States Currency sealed.

27. At approximately 11:14 a.m., Agent Abrahao issued Mr. Gatlin *Miranda Warnings,* at which time Mr. Gatlin stated he understood his rights and wanted an attorney. Agent Abrahao detained Mr. Gatlin, placing him in handcuffs. Agent Abrahao informed Mr. Gatlin that he will be detained based on the items found and the story he had given agents/officers did not match. Mr. Gatlin told Agent Abrahao that he was not violent. Agent Abrahao further explained that agents were no longer going to ask him questions, but he was going to remain detained until the investigation was completed.

28. Mr. Gatlin remained in the conference room with Officer Esquibel. At approximately 11:18 a.m., Agent Abrahao removed all items from Mr. Gatlin's pockets, which produced two jump drives, toothpicks, a prescription bottle with several different prescription medications and no label, a rolled up marijuana cigarette, and other personal items. Agent Abrahao readjusted the handcuffs on Mr. Gatlin and placed his hands in the front for comfort. Mr. Gatlin remained in the conference room with Officer Esquibel.

29. At approximately 11:36 a.m., while FFA Agent Beattie was conducting an interview with Mr. Gatlin, DEA Agent Virgilio Perez entered the conference room and asked Mr. Gatlin about the logbooks for the plane. Mr. Gatlin responded that he did not have the logbooks, and directed Agent Perez to ask his wife.

30. At approximately 12:02 p.m. Agent Perez returned to the conference room and asked Mr. Gatlin how he would pay for the fuel. Mr. Gatlin grabbed his credit card from his wallet and handed it to Agent Perez. Agent Perez explained that he was going to take the card to airport staff to pay for the fuel placed in Mr. Gatlin's plane.

31. At approximately 12:14 p.m., Agent Abrahao asked Mr. Gatlin if he had a prescription for the pills in the bottle. Mr. Gatlin responded that the bottle was for Meloxicam, and that he had a prescription for the Xanax in the bottle. Agent Abrahao asked if Mr. Gatlin had the prescription with him so Agent Abrahao could return the pills to Mr. Gatlin. Mr. Gatlin responded by saying, "Are you

8

going to take my Xanax dude?" Agent Abrahao further stated he would have no issues returning the medication to Mr. Gatlin as long Mr. Gatlin had the proper prescriptions. Agent Abrahao also stated that the labels were ripped off the bottle. Agent Abrahao explained that the bottle label bore the name, "Vernon."

32. At approximately 12:28 Agent Abrahao and Agent Croft entered the conference room, at which time Mr. Gatlin said, "officer please don't take my prescription." Agent Croft asked for the name of Mr. Gatlin doctor. Mr. Gatlin responded that he had a doctor for the Meloxicam prescription, but that he goes to different doctors. Mr. Gatlin stated that his prescriptions were filled at Ben Brooke Pharmacy in Fort Worth, TX. Agent Croft informed Mr. Gatlin that he had two different types of Xanax inside the Meloxicam pill bottle. Mr. Gatlin stated that he had Meloxicam, Flexeril, and Xanax.

33. Agent Abrahao reminded Mr. Gatlin that he was under *Miranda Warning*. Agent Abrahao explained to Mr. Gatlin that based on the things agents/officers had found inside of the airplane, agents/officers believed that the items were indicative of drug distribution. Agent Abrahao explained to Mr. Gatlin that he was going to be released, but that agents had probable cause to seize all items indicative of drug distribution including the airplane. Mr. Gatlin asked, "Are you taking my plane?" Agent Abrahao explained that any conveyance that is either proceeds of drug trafficking or facilitates drug trafficking can be seized. Agent Abrahao further explained that this case would be presented to the Unites States Attorney's Office and if charges were filed Mr. Gatlin would be notified in the future.

34. At approximately 12:31 p.m. Agent Abrahao presented Mr. Gatlin with a receipt and it lists all items being seized. Agent Abrahao further explained to Mr. Gatlin that his gun was being seized because federal law prohibits drug users to posses a gun, and that the gun was found with the drugs Mr. Gatlin admitted to using.

35. At approximately 12:32 p.m., Agent Croft showed Mr. Gatlin a black bag with currency in it, and explained to Mr. Gatlin that the bag was found inside his wife's luggage. Agent Croft explained that Mrs. Gatlin said she did not know anything about the money. Mr. Gatlin shook his head from side to side indicating he did not know. Agent Croft placed the money inside of a self-sealing evidence envelope (SSEE). Agent Croft showed a portion of the bag that Mr. Gatlin could sign to claim the money. Mr. Gatlin signed the SSEE. A pink gift bag containing United States Currency was shown to Mr. Gatlin. The bag and currency were placed inside of an SSEE. Mr. Gatlin signed the bag, which Agents Abrahao and Croft signed and sealed it. A third and last vacuum-sealed bag was presented to Mr. Gatlin, at which time Mr. Gatlin said, "Wow, somebody went through some trouble, I will claim it." Mr. Gatlin signed the bag, which Agents Abrahao and Croft signed and sealed it. Mr. Gatlin further stated, "It is not mine, but by God if it's in that plane I will claim it." Mr. Gatlin asked if he would get the money back. Agent Abrahao responded that Mr. Gatlin needed to consult with his attorney at that point.

36. At approximately 12:42 p.m. Agent Croft explained to Mr. Gatlin that because he did not have a prescription for the Xanax, it was going to be seized. Mr. Gatlin responded he did not have a prescription. Agent Croft explained to Mr. Gatlin that he would not charge him with the Xanax, but he could not leave with a Schedule IV substance without a prescription.

37. At approximately 12:46 p.m. Agent Abrahao released Mr. Gatlin.

38. Mr. Gatlin has a drug and criminal history

39. On February 20, 2018, the unknown amounts of U.S. currency were transported to Loomis Armored Transport for an official count. The currency located in the plastic grocery bag totaled $29,586. The currency located in the pink gift bag totaled $13,000. The currency located in the black canvas bag totaled $15,000. The currency totalled $57,586.

### FIRST CLAIM FOR RELIEF

40. The United States incorporates by reference the allegations in paragraphs 1 through 39 though fully set forth.

41. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

42. Defendant Currency was furnished, or intended to be furnished, in exchange for a controlled substance, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the Controlled Substances Act and is thus subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

### SECOND CLAIM FOR RELIEF

43. The United States incorporates by reference the allegations in paragraphs 1 through 39 as though fully set forth.

44. Title 18, United States Code, Section 981(a)(1)(C) provides, in part, for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a "specific unlawful activity" (SUA) as defined in 18 U.S.C. § 1956(c)(7), or conspiracy to commit such offense.

45. 18 U.S.C. § 1952 prohibits interstate and foreign travel or transportation with the intent to (1) distribute the proceeds of any unlawful activity; (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity. Unlawful activity is defined in 18 U.S.C. § 1952(b).

46.     Defendant Currency constitutes the proceeds of a violation of 18 U.S.C. § 1952 or derived from proceeds traceable to such property and, is thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE: Plaintiff seeks arrest of Defendant Currency and forfeiture of same to Plaintiff, determination of the validity and priority of claims of the Claimants and any Unknown Claimants to the Defendant Currency, costs and expenses of seizure and of this proceeding, and other proper relief.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

STEPHEN R. KOTZ
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274

## 28 U.S.C. § 1746 DECLARATION

I am a Special Agent with the Drug Enforcement Administration who has read the contents of the Complaint for Forfeiture *In Rem* to which this Declaration is attached; and the statements contained in the complaint are true to the best of my knowledge and belief.

I declare under penalty of perjury and the laws of the United States of America that this Declaration is true and correct, except as to matters stated on information and belief, and as to those matters I believe them to be true.

Dated: 7-2-2018

Geronimo A. Abrahao, Special Agent
Drug Enforcement Administration

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS
$57,586.00 IN U.S. CURRENCY

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability |  |  | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander |  | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine |  | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury – Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act |  | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee |  | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | ☐ 462 Naturalization Application |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions |  |  |
|  | ☐ 448 Education / ☐ 550 Civil Rights |  |  |  |
|  | ☐ 555 Prison Condition |  |  |  |
|  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(C)
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):* JUDGE _____ DOCKET NUMBER _____

DATE: 7/2/2018
SIGNATURE OF ATTORNEY OF RECORD: *[signature]*

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____